BARRETT S. LITT, SBN 45527
PAUL J. ESTUAR, SBN 167764
BRYAN B. MILLER, SBN 178134
E-Mail: pestuar@littlaw.com; bmiller@littlaw.com
LITT, ESTUAR, HARRISON, MILLER & KITSON, LLP
1055 Wilshire Boulevard, Suite 1880
Los Angeles, California 90017
Telephone: (213) 386-3114
Facsimile: (213) 380-4585

EARNEST BELL, SBN 159387
Law Offices of Earnest Bell
3844 W. Channel Island Blvd. PMB 170
Oxnard, CA.  93035
Telephone: (805)-218-0449
thebellsiii@yahoo.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN GAMINO, individually and as class representative; KATHY CONLEY, individually and as class representative; ED FERREL, individually and as class representative, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF VENTURA; VENTURA COUNTY SHERIFF BOB BROOKS, individually and in his capacity as Sheriff of Ventura County; DOES 1-10, <br><br> Defendants. | CASE NO. CV-02-9785 CBM (Ex) <br><br> [Honorable Consuelo B. Marshall] <br><br> PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES <br><br> [Filed Concurrently with Declaration of Barrett S. Litt, Exhibits, [Proposed] Order] <br><br> DATE:    JANUARY 19, 2009 <br> TIME:    10:00 A.M. <br> CRTRM:    2 |

1

TABLE OF CONTENTS

2

3

4

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................1

I.   INTRODUCTION ........................................................................1

II.  ANALYSIS OF THE FACTORS IN DETERMINING AN APPROPRIATE
     ATTORNEYS' FEE AWARD. ....................................................4
     A.  THE COMPLEXITY OF THE ISSUES ....................................4
     B.  THE RISKS OF NON-PAYMENT ASSUMED BY COUNSEL ....................8
     C.  THE EFFORT EXPENDED BY COUNSEL. .................................8
     D.  THE RESULT OBTAINED FOR THE CLASS ..............................9
     E.  COUNSEL'S EXPERIENCE ............................................10
     F.  COUNSEL'S SKILL .................................................11
     G.  THE REACTION OF THE CLASS .......................................11

III. THE AMOUNT REQUESTED BY PLAINTIFFS' COUNSEL IS VERY
     REASONABLE ...................................................................11
     A.  PERCENTAGE OF THE FUND METHOD OF CALCULATING FEES
         IN CLAIMS MADE SETTLEMENTS. ....................................12
     B.  FEE BASED ON LODESTAR WITH MULTIPLIER. ........................21

IV.  FAILING TO AWARD THE FEES AND COSTS REQUESTED WOULD
     FRUSTRATE THE PURPOSES OF CLASS ACTIONS IN THE CONTEXT
     OF THIS SETTLEMENT. .........................................................22

V.   CONCLUSION ..................................................................23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Beverly Hills Fire Litigation*
  639 F. Supp. 915 (E.D. Ky. 1986)............................................................2

*Bynum v. District of Columbia*
  412 F. Supp. 2d 73 (D.D.C. 2006) .........................................................4

*In re Cendant Corp. PRIDES Litigation*
  243 F.3d 722 (3rd Cir. 2001)................................................................13

*Battle v. Anderson*
  564 F.2d388 (10th Cir. 1977) ...............................................................10

*In re Charter Communications, Inc., Securities Litigation*
  2005 WL. 4045741 (E.D.Mo. 2005) .......................................................1

*Cosgrove v. Sullivan*
  759 F. Supp. 166 (S.D.N.Y.1991)............................................................2

*Craft v. County of San Bernardino*
  468 F. Supp. 2d 1172 (C.D.Cal. 2006)..............................................1, 4

*Di Giacomo v. Plains All America Pipeline*
  Nos. H-99-4137, H-99-4212, 2001 U.S. Dist. LEXIS 25532, (S.D.Tex. Dec. 18, 2001)..................................................................................................1

*Evans v. Stephens*
  407 F.3d 1272 (11th Cir.2005) ...............................................................6

*Fischel v. Equitable Life Assurance Society of the U.S.*
  307 F.3d 997 (9th Cir.2002) ...............................................................3, 5

*In re General Motors*
  55 F.3d 768 (3rd Cir. 1995).................................................................13

*Giles v. Ackerman*
  746 F.2d 614 (9th Cir.1984) ...................................................................6

*Glass v. UBS Financial Services, Inc.*,
   2007 WL. 221862 (N.D.Cal. 2007)....................................................................... 1

*Hunter v. Auger*
   672 F.2d 668 (8th Cir.1982) ........................................................................... 10

*In Re Merry-Go- Round Enterprise, Inc.*
   244 B.R. 327 (Bankr. D. Md. 2000)............................................................. 1, 2

*Johnston v. Comerica Mortg. Corp.*
   83 F.3d 241 (8th Cir. 1996) ........................................................................... 13

*Kennedy v. Los Angeles Police Department*
   901 F.2d 702 (9th Cir.1989)............................................................................. 5

*Masters v. Wilhelmina Model Agency, Inc.*
   473 F.3d 423 (2nd Cir. 2007) ........................................................................ 12

*Morales Feliciano v. Hernandez Colon*
   697 F. Supp.51 (D.Puerto Rico 1988) ........................................................... 10

*Paul, Johnson, Alston & Hunt v. Graulty*
   886 F.2d 268 (9th Cir. 1989) ........................................................................ 11

*Powell v. Barrett*
   514 F.3d 1298 (11th Cir. 9/4/08)..................................................................... 7

*In re Quintus Sec. Litigation*
   148 F. Supp. 2d 967 (N.D.Cal.2001)............................................................... 4

*In re Rite Aid Corp. Sec. Litigation*
   146 F. Supp. 2d 706 (E.D.Pa.2001)................................................................. 2

*In re Rite Aid Corp. Sec. Litigation*
   362 F. Supp. 2d 587 (E.D.Pa. 2005)................................................................ 1

*In re Rite Aid Corp. Securities Litigation*
   396 F.3d 294 (3rd Cir. 2005)........................................................................... 4

*Roberts v. Texaco, Inc.*
   979 F. Supp. 185 (S.D.N.Y. 1997)................................................................... 1

1

2

*Six Mexican Workers v. Arizona Citrus Growers*
    904 F.2d 1301 (9th Cir.1990) ............................................................... 1

3

4

*Staton v. Boeing Co.*
    327 F.3d 938 (9th Cir. 2003) ............................................................... 12

5

6

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.,*
    2005 WL. 1213926 (E.D.Pa.) ........................................................... 2, 3

7

8

*Thompson v. City of Los Angeles*
    885 F.2d 1439 (9th Cir. 1989) .............................................................. 5

9

10

*Torrisi v. Tucson Electric Power Co.*
    8 F.3d 1370 (9th Cir.1993) ................................................................... 3

11

12

*Van Vranken v. ARCO*
    901 F. Supp. 294 (N.D.Cal.1995) ......................................................... 3

13

14

*In re: Vitamins Antitrust Litigation*
    2001 WL. 34312839 (D.D.C.) ............................................................ 13

15

16

*Vizcaino v. Microsoft Corp.*
    290 F.3d 1043 (9th Cir. 2002) ................................................ 1, 2, 3, 11

17

18

*In re Washington Public Power Supply System Securities Litigation*
    19 F.3d 1291 (9th Cir. 1994) ......................................................... 5, 11

19

20

*Waters v. International Precious Metals Corp.*
    190 F.3d 1291 (11th Cir.1999) ........................................................... 12

21

22

*Way v. County of Ventura*
    445 F.3d 1157 (9th Cir. 2006) ...................................................... 3, 4, 5, 6

23

24

*Williams v. MGM-Pathe Commun. Co.*
    129 F.3d 1026 (9th Cir.1997) ............................................................ 12

25

26

27

28

# STATE CASES

*Kuhnlein v. Department of Revenue*
    662 So. 2d 309 (Fla. 1995) ....................................................................... 2

# FEDERAL STATUTES

42 U.S.C. §1988 ......................................................................................... 4

# STATE STATUTES

H&S §11550   ..................................................................................... 1, 2, 3

# MISCELLANEOUS

Herbert B. Newberg and Alba Conte, *Newberg on Class Actions* §14.6 (4th
    Ed. 2007 update) ................................................................................ 5, 12

John C. Coffee, Jr., *Reforming the Securities Class Action: An Essay on
    Deterrence and Its Implementation*, 2-3 ................................................... 6

Myriam Gilles*, Exploding The Class Action Agency Costs Myth: The Social
    Utility Of Entrepreneurial Lawyers, University of Pennsylvania Law
    Review,* 155 U. Pa. L. Rev. 103 (November 2006) .................................... 1

Richard A. Posner, *Economic Analysis of Law* 626-27 (5th ed. 1998) ................... 6

Silber and Goodrich, *Common Funds and Common Problems: Fee
Objections and Class Counsel's Response*, 17 RevLitig 525, 534 (1998) ............... 3

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Class Counsel seek an award of $1.4 Million, inclusive of fees and costs, to be paid separately from the payments made to class members, pursuant to the provisions of the settlement agreement. The settlement agreement provides as follows, subject to the final approval of the Court:

a)   **Class Member Tier 1 Payments:**  A Class Member who was strip searched during the Class Period and at the time of the booking was charged with an offense concerning weapons or violence in addition to a charge of violation of H&S §11550 shall be paid a one-time only sum of $250.00 (Two Hundred Fifty Dollars) by Defendants.

b)   **Class Member Tier 2 Payments:**  A Class Member who was strip searched during the Class Period and at the time of the booking was charged with an offense relating to a drug or narcotics offense in addition to a charge of violation of H&S §11550 shall be paid a one-time only sum of $650.00 (Six Hundred Fifty Dollars) by Defendants.

c)   **Class Member Tier 3 Payments:**  A Class Member who was strip searched during the Class Period and at the time of the booking was charged with violation of H&S §11550, but not with any weapons, violence or drug charge pursuant to a schedule listing such offenses, shall be paid a one-time only sum of $2,300 (Two Thousand Three Hundred Dollars) by Defendants.  If a Class Member who qualifies for a Tier 3 payment and who was subjected to a second separate and distinct arrest, booking and strip search during the Class Period that otherwise qualifies as Tier 3, Defendants shall pay a one-time only additional payment of $700 (Seven Hundred Dollars).  Defendants shall not be liable to pay for any additional amount for any additional strip search.

d)   **Lien Deductions:** The Claims Administrator shall deduct from any claim payment amounts owed by a claim participant for liens or court orders for restitution, child support, debts owed to the County of Ventura or any statutory liens. By filing a Claim Form, the class member agrees to allow the Claims Administrator access to his or her records regarding child support or potential statutory liens.

1. **Lien Challenge:** If a class member who has submitted a timely claim form is notified of a lien, and believes that there is a mistake of some kind, he or she shall have the right to seek a review of the lien by submitting a letter and documentation, which shall be reviewed by a Special Master, whose determination will be final and non-appeable. No hearing shall be held on such review unless ordered by the Special Master.

2. **Limitation on Lien Deduction:** No more than 50% of the amount due to a claimant may be deducted to pay such restitution, debts or liens, so all qualifying claimants will receive some money even if such deductions occur.

e)   **Class Administration Fees:** Defendants are responsible for separate payment of settlement administration fees.

f)   **Named Plaintiff Payments:** Defendants are responsible for separate payment of a total not exceeding $150,000 to the three Named Plaintiff Class Representatives combined.

g)   **Possible Class Members:** For the fist part of the class period, defendants' computer records only record the primary charge against an arrestee. Thus, if the person was arrested on H&S §11550, and another charge, and the other charge was considered primary by the Sheriff, the §11550 charge would not appear in the computer record, but such people are class members. This problem was addressed by mailing Possible Class Member letters to anyone who met specified

2

criteria (specifically, anyone who had a primary charge that matched any of the charges for the second class period that accompanied a §11550 charge). Those people can mail in class claims, and the existence of a simultaneous §11550 charge will be independently verified.

**h)**   An award of attorneys' fees and costs, to be separately paid by the Defendants, in the amount of $1,400,000, subject to the final approval of the Court.

The custom and practice that was the basis of this lawsuit – strip searching those arrested for violation of H&S Code §11550 (under the influence of a controlled substance) has ceased as a result of the related litigation in *Way v. County of Ventura*, 445 F.3d 1157 (9th Cir. 2006) (hereafter *Way*). *Way* was an individual plaintiff case, also before this Court. *Gamino* was filed separately after *Way*, as a class action. After the favorable decisions in this Court and the Ninth Circuit occurred, *Way* was settled for a total of $575,000. Of that amount, $500,000 was for fees and costs, and the remainder was for the Plaintiff. We provide this information in the interest of full disclosure, and so that the Court can accurately assess the reasonableness of the fee request here. Accordingly, in analyzing the reasonableness of this fee request, we will include the *Way* fee and the *Way* hours both. This is because the issues in the two cases are so intertwined that there really is no way to separate them.

It is well settled in the Ninth Circuit that, "[i]n a common fund case, the district court has discretion to apply either the lodestar method or the percentage-of-the-fund method in calculating a fee award." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1006 (9th Cir.2002). "Reasonableness is the goal." *Id.* at 1007. The Ninth Circuit has "established 25% of the common fund as the 'benchmark' award for attorney fees." *E.g., Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir.1993). We will analyze the requested fees under both standards.

## II.   ANALYSIS OF THE FACTORS IN DETERMINING AN APPROPRIATE ATTORNEYS' FEE AWARD.

Although not mandated by the Ninth Circuit, courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's loadstar. *See, e.g., In re Heritage Bond Litigation,* 2005 WL 1594403 at 18*; In re Quintus Sec. Litig.,* 148 F.Supp.2d 967, 973-74 (N.D.Cal.2001). Because this provides a useful framework for analyzing the appropriate fee award here, Counsel will employ that framework in analyzing the requested fee here, although we will reverse the order of discussion.

### A.   *THE COMPLEXITY OF THE ISSUES*

Congress recognized the complexity of civil rights cases when the civil rights attorneys' fee statute (42 U.S.C. §1988) was passed in 1976. The legislative history states, "It is intended that the amount of fees awarded under S. 2278 (42 U.S.C. §1988) be governed by the same standards which prevail in other types of equally complex federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature." S.Rep.No. 94-1011, 1976 U.S.Code Cong. & Admin.News at 5913.

The issues involved in this case involve complex issues of constitutional law in an area where considerable deference is given to jail officials, as Courts recognized in the partial summary decision in this case. *See Way v. County of Ventura, supra,* 445 F.3d at 1161 (9th Cir.2006) ("We recognize the difficulty of operating a detention facility safely, the seriousness of the risk of smuggled weapons and contraband, and the deference we owe jail officials' exercise of judgment in adopting and executing policies necessary to maintain institutional security."); *Craft v. County of San Bernardino*, 468 F.Supp.2d 1172, 1176 (C.D.Cal. 2006) (quoting *Way*).

4

The *Way* case, which provided the legal foundation for the settlement here (as the parties stipulated that the outcome of *Way* would govern here), involved difficult questions of constitutional law. A good snapshot of the state of the law at the time is contained in *Way v. County of Ventura,* 445 F.3d 1157, 1159 (9th Cir.2006), where the Court provided the following summary:

> "Way brought this civil rights action … alleging that they violated her civil rights under the Fourth and Fourteenth Amendments by subjecting her to a body cavity search following her arrest. The parties both filed motions for summary judgment. The district court held that the search violated *Way*'s constitutional rights because individualized suspicion is required for arrestees who are not admitted to the general jail population. It denied qualified immunity to Brooks and Hanson on the basis of *Giles v. Ackerman,* 746 F.2d 614, 616-17 (9th Cir.1984) (per curiam), *overruled on other grounds by Hodgers-Durgin v. de la Vina,* 199 F.3d 1037, 1040 n.1 (9th Cir.1999) (en banc); *Kennedy v. Los Angeles Police Dep't,* 901 F.2d 702, 711 (9th Cir.1990) (as amended), *implied overruling on other grounds recognized by Act Up!/Portland v. Bagley,* 971 F.2d 298, 301 (9th Cir.1992); and *Fuller v. M.G. Jewelry,* 950 F.2d 1437, 1446 (9th Cir.1991), holding that a reasonable officer reviewing Ventura's policy and the established law would have recognized that the Sheriff Department's policy was unconstitutional because it did not further any legitimate penological interests. That ruling is the subject of this appeal."

What was distinct about this case and the *Way* case was that it involved strip searches of arrestees charged with a drug offense. The Ninth Circuit had ruled long before that the involvement of drugs supplied reasonable suspicion for a strip search. *See, e.g., Thompson v. City of Los Angeles*, 885 F.2d 1439, 1447 (9th Cir. 1989) (reasonable suspicion may be supplied by the nature of the charge); *See Kennedy v. Los Angeles Police Dep't.,* 901 F.2d 702, 716 (9th Cir.1989) (holding unconstitutional a strip search policy applied to person arrested for stealing a

1   roommate's belongings, observing that "[n]o weapons, no drugs, no contraband, no

2   violent acts of any kind were involved"); *Giles v. Ackerman,* 746 F.2d 614, 618

3   (9th Cir.1984) (per curium) (declaring unconstitutional a policy requiring that all

4   persons booked on minor traffic offenses be strip searched, while noting that the

5   "offense was minor and was related neither to drugs nor to weapons").

6          Thus, Plaintiffs had to prevail on the argument that being under the influence

7   of drugs was fundamentally different in kind from possession or trafficking in

8   drugs and did not provide reasonable suspicion. Plaintiffs succeeded in that

9   contention, paving the way for the current settlement. See *Way*, 445 F.3d at 1162

10  ("We cannot see how the charge of being under the influence of a drug necessarily

11  poses a threat of concealing (and thereby using or trafficking) additional drugs in

12  jail during the limited time between booking and bail, or booking and placement in

13  the general population. If not, it was unreasonable to assume that *Way* harbored

14  drugs in some cavity or other.").

15         The Ninth Circuit's previous cases had suggested, without deciding, that

16  drugs would be a per se justification for a pre-arraignment strip search. *See

17  Kennedy, Giles, supra*. Plaintiff ultimately prevailed before the Ninth Circuit,

18  which acknowledged it had never directly addressed the issue in deciding that the

19  Sheriff was entitled to qualified immunity. *Id.* ("we had never previously addressed

20  the constitutionality of a body cavity search policy premised on the nature of this

21  or any other drug offense. More importantly, we had held that the nature of the

22  offense alone may provide reasonable suspicion [citation omitted], and twice

23  pointed to charges involving drugs, contraband and violence as the kind of offense

24  that might give rise to reasonable suspicion.").

25         The decision has even greater impact when viewed in light of parallel

26  developments in strip search law. *Way* was decided in 2006. Before that, the 11th

27  Circuit, in *Evans v. Stephens,* 407 F.3d 1272 (11th Cir.2005) (en banc), suggested

28  that entry into the general population may be a per se justification for a strip/visual

body cavity search. While *Way* was not a general population case, this statement

6

sent a shot across the bow of what had been a general Circuit consensus that placement of a pre-arraignment arrestee in the general population did not provide, in and of itself, justification for a blanket strip search policy. Since *Way*, the 11th Circuit decided *Powell v. Barrett*, 514 F.3d 1298 (11th Cir. 9/4/08) (en banc), in which it held that placement in the general population of a pre-arraignment arrestee was a per se justification for a blanket strip search policy, regardless of any other factors. Thus, strip search law and remains far from settled.

In addition, properly handling the data in cases of this type requires a high degree of sophistication. In cases like this, proper use of the data is the factual key to the case (along with establishing the policies or customs being challenged, which occurred during the *Way* case). It is through the data that members of the class are identified. This is usually a sophisticated process, requiring counsel familiar with both the facts of the case and how to use the data. Jail data is not configured to straightforwardly answer the questions for which answers are needed to determine class composition. Code has to be written to take all of those factors into account. Then the analysis has to be discussed between Plaintiffs and Defendants, in order to work out agreement on the data issues. All of this occurred here.

There are relatively few attorneys qualified to handle the data issues in a case such as this to the maximum degree of effectiveness. When Mr. Litt came into the case, Plaintiffs had not yet undertaken an independent data analysis. After Mr. Litt's entry, data consultants he had used previously analyzed all the data. As a result, the class list changed. In addition, it was determined that there was a whole group of people regarding whom no determination whether they were strip searched could be reached one way or the other from the available data. This is because, for the earlier part of the class period, the data only captured the lead charge, but there may have been a secondary §11550 charge on the basis of which the arrestee was strip searched. The solution to this problem was developed through the use of the Possible Class Member mailing.

7

## B.   THE RISKS OF NON-PAYMENT ASSUMED BY COUNSEL

There was substantial risk of non-payment that Plaintiffs' counsel faced. Obviously, the County had the resources to pay a judgment. The risk lay in establishing that the County's policies were illegal. This was discussed at some length in the previous section, and will not be repeated here. The fact is that strip search litigation in general is inherently risky because of the deference given jail officials, and because there is a split in circuits developing. *See* §II (A), *supra*. Seeking large amounts of money from government entities always carries risks of politics entering into the equation.

Class counsel, particularly Mr. Bell, declined substantial other work to pursue this case. These two cases combine (*Way* and *Gamino*) spanned many years when the outcome was uncertain. Over 2000 hours were devoted to the combined *Way* and *Gamino* cases.

## C.   THE EFFORT EXPENDED BY COUNSEL.

Counsel litigated this case to the eve of trial. The work performed included: 1) extensive investigation of the underlying circumstances, including speaking with scores of class members; 2) preparation of the complaint; 3) the Rule 26 conference and report; 4) three requests for production of documents; 5) extensive analysis of documents produced; 6) three set of interrogatories; 7) 12 depositions; 8) three discovery motions; 9) a motion to compel Sheriff Brooks' deposition; 10) three summary judgment motions; 11) two published appeals in *Way* (one remanding because appealed order was not final for purposes of appeal, and the second upholding this Court's grant of summary judgment to Plaintiffs); 12) preparation and mailing of first class notice (pre-settlement); 13) handling of hundreds of class members calls after mailing of first class notice; 14) retention of data consultants and extensive analysis of computerized jail data; 15) list of charges qualifying as charges of violence, weapons or drugs for purposes of the different levels of class claims; 16) three days of unsuccessful mediation efforts with Ret. Mag. Judge Edward Infante (including multiple mediation sessions); 17)

1    four mediation sessions with Magistrate Judge Charles Eick; 18) preparation of a

2    14-page mediation letter in anticipation of mediation with Ret. United States

3    District Judge Raul Ramirez; 19) two days of mediation sessions with Judge

4    Ramirez; 20) and negotiation and preparation of settlement documents, including

5    settlement agreement, preliminary and final approval orders, class notice and claim

6    forms.

7         In summary, Class Counsel's efforts were extensive and involved all that

8    occurs in a case that is litigated up to the eve of trial.

9         D.    *THE RESULT OBTAINED FOR THE CLASS*

10        This case was hard fought. The *Way* case, in which the key merits issues

11   were fought out, went through extensive briefing in this Court and the Ninth

12   Circuit. The class members were people of little means. All the work was

13   performed on a contingent fee basis. The settlement was the result of arm's length

14   negotiations entered only after Plaintiffs won the *Way* case. Even then it required

15   over a year of settlement efforts, and the addition of Mr. Litt to Plaintiffs' attorney

16   team, to reach a settlement.

17        The financial terms of the settlement are very favorable to class members.

18   Those not charged with crimes of violence or involving other drug charges receive

19   $2300 for a first offense and $700 for a second offense. This is considerably higher

20   than the average recovery in other strip search class actions. See Declaration of

21   Barrett S. Litt, ¶35. While this is partly explained by the scale of the other cases

22   compared to this one, the fact remains that class members are receiving very

23   favorable payments. In addition, even those charged with other drug charges or

24   crimes of violence are participating in the settlement, even though the law in this

25   Circuit is that such charges provide reasonable suspicion to strip search pre-

26   arraignment arrestees. See discussion in ¶ II (A), *supra*. All of this is due

27   exclusively to Class Counsel's efforts.

28        Nor can the results in this case be judged solely by the monetary component

of the settlement. As a result of the combined *Way* and *Gamino* litigation, the

9

1    County long ago ceased all of the strip search practices addressed in this

2    settlement. That is a major accomplishment, particularly in light of the standing

3    limitations imposed on such cases. Thus, as a result of counsel's efforts, tens of

4    thousands of future inmates have been spared the "embarrassing and humiliating

5    experience", and "extensive intrusion on personal privacy", that a strip search,

6    "regardless of how professionally and courteously conducted", necessarily entails.

7    *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982).

8        Unlike most class actions, the Plaintiffs were persons charged with crimes

9    and, thus, not people generally considered sympathetic or desirable by the public at

10   large. *Cf., e.g., Battle v. Anderson* 564 F.2d388, 398 (10th Cir. 1977) (in prisoner

11   civil rights class action, "plaintiffs' class are generally a feared and despised

12   class"); *Morales Feliciano v. Hernandez Colon*, 697 F.Supp.51, 60 (D.Puerto Rico

13   1988) ("The general population's attitude toward those who commit or are accused

14   of committing crimes is understandably one bordering in despise. Many Puerto

15   Ricans believe that since plaintiffs are criminals, they deserve the conditions under

16   which they live in the prisons.").

17       E.    **COUNSEL'S EXPERIENCE**

18       Class Counsel are highly experience litigators in the fields of civil rights and

19   class actions. Mr. Litt is known as having a particular expertise in civil rights class

20   actions and other complex multi-party civil rights cases, especially law

21   enforcement class actions. He has both spoken and published on the issue of strip

22   search and law enforcement class actions at some length, and is counsel in several

23   other pending class actions, both in California, and in other parts of the country

24   (Washington, D.C., Baltimore and Atlanta). In addition, he has several $1 Million

25   plus civil rights trial verdicts, including a $22.5 Million verdict against the City of

26   Long Beach, which is the largest Fair Housing verdict on record. See Litt Dec. ¶¶

27   1-12, and his curriculum vita attached as Exhibit "1" to his Declaration.

28

Earnest Bell is an experienced civil rights litigator, who has practiced primarily in Ventura County, and has been the most prominent plaintiffs' police abuse attorney in Ventura County for many years. He litigated the *Way* case through the Ninth Circuit and settlement. He litigated the first part of the *Gamino* case, and brought in Mr. Litt when he determined that the settlement process would be aided by a civil rights lawyer experienced in class actions.

### F.   COUNSEL'S SKILL

This issue has been answered by the discussion above. There can be little doubt that counsel in this case are highly skilled attorneys in the field of civil rights and civil rights class actions, particularly law enforcement class actions. The Court is in a position to assess for itself the level of skill of Plaintiffs' counsel. We will not elaborate further.

### G.   THE REACTION OF THE CLASS

As of the time of this writing, Plaintiffs' counsel has not yet received reports of the number of claims, opt-outs, or objections filed. That information will be provided in connection with the final approval hearing.

## III.   THE AMOUNT REQUESTED BY PLAINTIFFS' COUNSEL IS VERY REASONABLE

In this case, Plaintiffs' counsel seek an award of $1.4 Million in addition to the $500,000 received in the *Way* case. This encompasses both fees and costs. (Costs are relatively modest, totaling under $15,000, which includes all the specialized data work performed by consultants retained by Plaintiffs.) It is well established in the Ninth Circuit that, while the court has discretion to use either a percentage of the fund or a lodestar approach in compensating class counsel (*see, e.g., Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1295 (9th Cir. 1994), the percentage of the fund is the typical method of calculating class fund fees. *E.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("the primary basis of the fee award remains the percentage method").

A.   *Percentage of the Fund Method of Calculating Fees in Claims Made Settlements.*

Where there is a claims made settlement, such as here, the percentage of the fund approach in the Ninth Circuit is based on the total money available to class members, plus costs (including class administrative costs) and fees. It is well established that, in claims made or class reversion cases (where there is a maximum fund, and unclaimed funds revert to the defendant), it is appropriate to award class fund attorney's fees based on the gross settlement fund. *See* Herbert B. Newberg and Alba Conte, *Newberg on Class Actions* §14.6 (4th Ed. 2007 update) ("[i]n *Boeing Co. v. Van Gemert*, 444 U.S. 156, 100 S. Ct. 745 (1980), the Supreme Court settled this question of whether class fund fees are based on the gross settlement or net settlement funds actually claimed by ruling that class counsel are entitled to a reasonable fee based on the funds potentially available to be claimed, regardless of the amount actually claimed"); *Williams v. MGM-Pathe Commun. Co.,* 129 F.3d 1026 (9th Cir.1997) (reversing award of attorney's fees because trial court failed to base fee award on the entire settlement, rather than the amount claimed); *Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1295 (11th Cir.1999) (distribution of attorneys' fees are to be based upon the funds available to eligible claimants, whether claimed or not; affirming a fee award nearly twice the amount actually claimed by the class from the fund); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2nd Cir. 2007) (the "entire Fund… is created through the efforts of counsel at the instigation of the entire class"; an "allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not").

Fees and class administration costs are included in determining the size of the fund. *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 967 (9th Cir. 2003) ("constructing a hypothetical 'fund' by adding together the amount of money Boeing would pay in damages to members of the class under the agreement, the amount of fees provided to various counsel, the cost of the class action notices paid

for by Boeing, and a gross amount of money ascribed to all the injunctive relief contained in the agreement"; court accepted the concept but not its application under the specifics there); *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 245 - 246 (8th Cir. 1996)(although "technically" defendant would pay fees directly rather than their being paid "out of the class' recovery… in essence the entire settlement amount comes from the same source"; even if "the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery", and, "[a]ccordingly, the direct payment of attorney fees by defendants should not be a barrier to the use of the percentage of the benefit analysis"), citing *In re General Motors,* 55 F.3d 768, 821 (3rd Cir. 1995) (the "rationale behind the percentage of recovery method also applies in situations where, although the parties claim that the fee and settlement are independent, they actually come from the same source"); *In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722, 734 (3rd Cir. 2001) ("[t]hough this is not a traditional common-fund case, because the unclaimed portion of the settlement fund is returned to Cendant and because the plaintiffs who recover may not be affected by the attorneys' fee award (depending on the number of plaintiffs who recover rights from the fund), use of the percentage-of-recovery method is appropriate in this case"); *In re: Vitamins Antitrust Litigation*, 2001 WL 34312839 (D.D.C.) (**"**it is appropriate to treat this case as a constructive common fund despite the fact that the fees in the instant action are to be paid by defendants"; total value of constructive fund for percentage of fee purposes determined by adding the value of the fund exclusive of fees to be paid separately by defendants plus maximum amount of attorney's fees to be paid).

In this case, there is a total of at least 3412 class pay-outs. The table below lists the value of each. This list is low and does not include the 6292 possible class members to whom letters will be sent, a significant (but currently unknown) number of whom are also class members.

13

| KNOWN CLASS MEMBER PAYOUTS | | | |
|---|---|---|---|
| **TIER** | **# CLASS MEMBERS[1]** | **AMOUNT** | **TOTAL** |
| Tier 1 | 227 | $250 | $56,750.00 |
| Tier 2 | 873 | $650 | $567,450.00 |
| Tier 3 | 1845 | $2300 | $4,243,500.00 |
| Tier 3 Repeat | 467 | $700 | $326,900.00 |
| | 3412 | | $5,194,600.00 |

The next table adds the total value of just those payouts to the class administration costs and the $1.4 Million in attorneys' fees, and then determines what percentage of the class fund the $1.4 Million represents. This table does not include the *Way* settlement.

| PERCENTAGE OF FUND EXCLUDING *WAY* | | |
|---|---|---|
| **TOPIC** | **PERCENTAGE** | **AMOUNT** |
| Minimum Class Value - Total | | $5,194,600.00 |
| Named Class Reps | | $150,000 |
| Class Administration | | $250,000 |
| Attorneys' Fees/ Costs - *Gamino* | | $1,400,000 |
| Total | | $6,994,600.00 |
| $1,400,000 Fee/Costs as % of Fund | 20.01% | |

The next table adds the value of the *Way* $575,000 settlement, allocating $75,000 as payment to *Way* and $500,000 as additional fees to Class Counsel,  and then presents what percentage of the class fund the $1.4 Million represents.

| PERCENTAGE OF FUND INCLUDING *WAY* | | |
|---|---|---|
| **TOPIC** | **PERCENTAGE** | **AMOUNT** |
| Minimum Class Value - Total | | $5,194,600.00 |
| Named Class Reps | | $150,000 |
| *Way* Individual Recovery | | $75,000 |
| Class Administration | | $250,000 |
| Attorneys' Fees/ Costs - *Gamino* | | $1,400,000 |

---

[1] These may not be the final numbers, but they are close enough to do a reliable calculation. If the numbers differ, they are greater, not less.

14

| PERCENTAGE OF FUND INCLUDING *WAY* | | |
|---|---|---|
| TOPIC | PERCENTAGE | AMOUNT |
| Attorneys' Fees/ Costs - *Way* | | $500,000 |
| Total | | $7,569,600.00 |
| $1,900,000 Fee/Costs as % of Fund | 25.1%[2] | |

Thus, using either percentage of the fund method (i.e., including or excluding *Way*), the fees and costs are squarely within the accepted 25% of the fund that is the "benchmark" in this Circuit. *See, e.g., Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir.1990) (establishing benchmark percentage of 25% of the fund as normal class counsel percentage of fund award). Although not sought here, the Ninth Circuit has held that the achievement of "exceptional results" for the class can justify an upward departure from the 25 percent benchmark include. *See Vizcaino,* 290 F.3d at 1048 (affirming fee award of 28 percent of settlement fund).

A lodestar cross-check is not required in this circuit, and in some cases is not a useful reference point. *See, e.g., Glass v. UBS Financial Services, Inc.*, 2007 WL 221862, 16 (N.D.Cal. 2007). In *Glass*, no lodestar cross-check was required by the Court where an early settlement resulted in exceptional results for the class even though some class members and the New York attorney general objected to the 25% of the fund request as excessive. (As of the time of this writing, counsel in this case has received no information indicating that there have been any objections to the settlement to date.) The *Glass* Court awarded fees of $11,250,000 despite the fact that the $45 Million fund was subject to a reversion for unclaimed funds so that the actual fund could end up being substantially less than the theoretical fund.

If a lodestar cross check, or lodestar as the basis of the fee were to be employed, the starting point is to determine the lodestar itself. In Exhibits 3 and 4

to this motion, the detail for the work performed in the *Way* and *Gamino* cases combined is set forth. (So much of the work applied to both cases that it was not realistic to attempt to divide them.) The total lodestar for both is reflected in the table below.

| Atty | Hourly rate | # Hours | Total |
|------|-------------|---------|-------|
| Earnest Bell | $600 | 1,602.50 | $961,500.00 |
| Barrett S. Litt | $750 | 187 | $140,250.00 |
| Charla Gray | $275 | 5.3 | $1457.50 |
| Julia White | $235 | 37 | $8695.00 |
| **Total** | | | **$1,111,902.50** |

The rates used here are reasonable. Numerous declarations have been filed that were submitted in *Craft v. County of San Bernardino*, 2008 WL 916965 (C.D.Cal. April 01, 2008), establishing the reasonableness of these rates, and those declarations are a year out of date. In addition, Mr. Litt has submitted a declaration establishing that his then current rates have frequently been awarded by courts. As the Court noted previously, constitutional litigation is complex federal litigation, and should be compensated accordingly. In *Craft*, District Judge Stephen Larson, using 2007 rates, found that "rates ranging from a high of $725 per hour for Mr. Litt (an attorney with 38 years experience) to a low of $275 for 2006 graduates, as well as law clerk rates of $200 per hour and paralegal rates from a low of $110 to a high of $225 per hour" were "supported by numerous declarations… establish[ing] that the hourly rates set are similar to those for attorneys of comparable skill and experience at the rates paid for complex federal litigation" and that "the rates sought are reasonable and reflect the market for attorneys of comparable skill,

---

[2] The costs exceed .1% of the total fund value, thereby making the fees slightly less than 25% of the fund.

16

experience and expertise in complex federal litigation." *Id*. at 9. Judge Larson also noted that it "was Congress' intent for civil rights cases [to use the standard of complex litigation in setting civil rights fee rates]. *See City of Riverside v. Rivera,* 477 U.S. 561, 575-576 (1986) (quoting Senate Report, at 6, U.S. Code Cong. & Admin. News 1976, p. 5913, *supra,* (Congress intended civil rights fees to be comparable to that for 'other types of equally complex Federal litigation, such as antitrust cases')." *Id*.

Plaintiffs anticipate that the lodestar will increase by approximately $100,000 plus in the course of the remaining work on the case, including work between now and the settlement and work over the ensuing period through the final distribution of the funds. (The post-settlement work is expected to be somewhat extensive due to the process of deciding issues such as which possible class members are in fact class members, lien issues and the like). Thus, the total lodestar is approximately $1.2 Million, which would result for the combined *Way* fee of $500,000 and this fee of $1.4 Million in a multiplier of approximately 1.6.

This is a modest multiplier. Many cases have authorized far higher multipliers. *See, e.g., Craft v. County of San Bernardino*, 2008 WL 916965 (C.D.Cal. 2008) (**multiplier of 5.2** in case settled for $25,500,000; Mr. Litt lead counsel); *In re Charter Communications, Inc., Securities Litigation*, 2005 WL 4045741, 18 (E.D.Mo. 2005) (20% of $146,250,000 fund awarded; **multiplier of 5.61**); *In re Rite Aid Corp. Sec. Litig,* 362 FSupp.2d 587 (E.D.Pa. 2005) (25% of $126,800,000 fund awarded; **multiplier of 6.96**); *Di Giacomo v. Plains All Am. Pipeline,* Nos. H-99-4137, H-99-4212, 2001 U.S. Dist. LEXIS 25532, at 31, 2001 WL 3463337 at 10 (S.D.Tex. Dec. 18, 2001) (awarding 30% of $29.5 Million fund; **multiplier of 5.3**); *In re Charter Communications, Inc., Securities Litigation,* 2005 WL 4045741, 18 (E.D.Mo. 2005) (20% of fund awarded in recovery of $146,250,000, **multiplier of 5.61**); *Roberts v. Texaco, Inc.,* 979 F.Supp. 185, 197 (S.D.N.Y. 1997) (fee award of approximately 16.7% of the fund, **multiplier of 5.5**, plus fund set aside to compensate for post-settlement work); *In Re Merry-Go-*

*Round enterprise, Inc.* (Bankr. D. Md. 2000) 244 B.R. 327 (40% award for $71 million fund awarded, resulting in a cross-check **multiplier of 19.6**), cited with approval in *Vizcaino v. Microsoft Corp.,* 290 F3d 1043, 1052 (9th Cir. 2002); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926 (E.D.Pa.) (**multiplier of 15.6** in a $100 Million settlement); *Cosgrove v. Sullivan,* 759 F.Supp. 166, 167 n. 1 (S.D.N.Y.1991) (1% of $1 Billion right to Medicare reimbursement awarded, resulting in **multiplier of 8.74**); *In re Beverly Hills Fire Litigation*, 639 F. Supp. 915 (E.D. Ky. 1986) (fee of $4,121,926 in settlement of $14 Million; multiplier of 5 for lead counsel in mass tort class action for risk and superior trial skill); *Kuhnlein v. Department of Revenue*, 662 So.2d 309, 315 (Fla. 1995) (class fund award of 10% of $188,100,000, resulting in multiplier of approximately 15, reduced by Fla. Supreme Court to **multiplier of 5** times lodestar, because lodestar was proper method under Florida law); *Wilson v. Bank of Am. Natl. Trust & Savs. Assn.*, No. 643872 (Cal. Sup. Ct. 9/16/82) (**multiplier of 10** times then hourly rate of $150), cited in *Newberg*, 14:6, p.578, fn. 87; *In re Beverly Hills Fire Litigation*, 639 F. Supp. 915 (E.D. Ky. 1986) (fee of $4,121,926 in settlement of $14 Million; **multiplier of 5** for lead counsel in mass tort class action for risk and superior trial skill).[3]

    See also the following cases cited in the Appendix in *Vizcaino v. Microsoft Corp.,* 290 F3d 1043 (9th Cir. 2002): *In Re IDB Communication Group, Inc.,* Sec. Litig., No. 94-3618 (C.D.Cal. Jan. 17, 1997)(Hupp, J.), cited at 19 Class Action Reports 472-73 (1996) (16.5% of $83 Million fund awarded; **multiplier of 6.2**); *In re Merry-Go-Round Enterprise, Inc.,* 244 B.R. 327 (Bankr.D.Md.2000) (40% of $185 Million fund awarded; **multiplier of 19.6**); *In re Rite Aid Corp. Sec. Litig.*, 146 F.Supp.2d 706 (E.D.Pa.2001) (in $193 Million fund, class counsel awarded fee

---

[3] Since a multiplier of 1x1 is 1, *Newberg* is referring to the amount of the enhancement, not the total. As the phrase "multiplier" is used in these two paragraphs, it refers to the total, e.g., a multiplier of 2 is 2 x the lodestar.

of 25% of fund, which amounted to $48 Million and represented a **multiplier of 4.5-8.5**); *In Re Aetna, Inc. Sec. Litig.*, Fed. Sec. L. Rep. P 91,322, 2001 WL 20928 (E.D.Pa. Jan.4, 2001) (in $83 Million fund, class counsel awarded fee of 29.5% of fund, which amounted to $24 Million and represented a **multiplier of 3.6**); *Van Vranken v. ARCO,* 901 F.Supp. 294 (N.D.Cal.1995) (in $76 Million fund, class counsel awarded fee of 25%, which amounted to $19 Million and represented a **multiplier of 3.6**).

In this case, Plaintiffs' counsel obtained a relatively expeditious and "excellent result" in a "complex and risky case". *See Stop & Shop,* 2005 WL 1213926 (E.D.Pa.), *supra*. The *Way/Gamino* case, when initially filed in *Way*, was a very risky case. The size of the recovery is substantial. The "skill and experience brought to bear by counsel throughout the year[s] they spent actively litigating this case, and the economy with which they were able to achieve such a noteworthy settlement" all speak to a substantial fee award. Further, "the award is justified by the high caliber of Plaintiffs' counsels' work in this case." *Stop & Shop*, *supra.*

Unlike *Stop & Shop*, this case is not a megafund case, in which fees more commonly will be under the 25% benchmark in this Circuit. S*ee* Appendix in *Vizcaino v. Microsoft Corp., supra*, 290 F3d 1043 (9th Cir. 2002) (providing fees in megafund cases between $50 Million - $100 Million). In fact, in cases under $10 Million, the awards more frequently will exceed the 25% benchmark. *See Van Vranken v. Atlantic Richfield Co*., 901 F.Supp. 294, 299 (N.D.Cal. 1995). Even in the cases cited in the *Vizcaino* Appendix, which are all megafund cases where the recovery exceeds $50 Million, half the cases resulted in a fee of 25% or more (including *Vizcaino* itself, where the fee was 28% of a $97 Million fund, with a multiplier of 3.65). Further, the 25% figure compares favorably with the general percentage of recovery awarded in cases around the country, where the percentage of the fund award is generally higher. *See* Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 RevLitig 525, 534 (1998) (summarizing available data and recommending that a

33% of the fund fee award is both reasonable, and in line with the general market for contingent fee work); *In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 303 (3rd Cir. 2005), citing three studies ("[O]ne study of securities class action settlements over $10 million ... found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period ... found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million ... found recoveries in the 25-30% range were 'fairly standard.'") (citations omitted).

A useful comparison is the decision in *Bynum v. District of Columbia*, 412 F. Supp. 2d 73 (D.D.C. 2006), awarding a fee of 1/3 of a $12 Million fund, plus costs. Mr. Litt was counsel in that case, which settled both over-detentions and post-release strip searches in the District of Columbia. The multiplier in that case was a multiplier of two, higher than here.

In making the award, Judge Lamberth observed that:

❖ The plaintiffs "engaged in protracted efforts over a period of four years to obtain this settlement, which the court considers to be an outstanding settlement both in its monetary and in its non-monetary terms," leading to an "exceptional" result.

❖ The litigation was "complex…, involving novel issues, and the effort that went into the results reflects that fact."

❖ "Extraordinary effort went into the resolution of these cases, not only through litigation, but through many hours of mediation."

❖ The issues were "hotly contested."

❖ "The outcome of this case was unclear and subject to serious risk of lack of success at the time the cases were filed and during the course of the litigation. The court is aware that cases of this nature are extremely risky and burdensome for plaintiffs' counsel."

20

❖ "Class counsel did an outstanding job and obtained exceptional results for the class."

❖ [S]ubstantial benefits were conferred on the class beyond the monetary recovery for the class, in the form of the significant policy changes in the operation of the Department of Corrections that resulted from this litigation. This is a substantial factor in the court's determination of the appropriate fee."

❖ "The attorneys involved in this litigation on behalf of the class are experienced and capable civil rights attorneys."

B.   *FEE BASED ON LODESTAR WITH MULTIPLIER.*

Even if the fee here were to be based on lodestar exclusively, rather than percentage of the fund, a multiplier would be appropriate. *See, e.g., In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1301 (9th Cir. 1994) ("because we find [*City of Burlington v.*] *Dague's* [505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)] reasoning [generally prohibiting multipliers in statutory fee shifting cases] inapposite in the common fund context, we hold that district courts have discretion to use risk multipliers to enhance the lodestar in common fund cases"; reversing district court's denial of multiplier because there was "no basis in the record for the court's finding that Class Counsel's decision to represent the class was not driven, at least in part, by an expectancy that their fees would be enhanced if they were successful"); *Fischel v. Equitable Life Assur. Society of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002) ("[i]t is an abuse of discretion to fail to apply a risk multiplier, however, when (1) attorneys take a case with the expectation that they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence that the case was risky") (citing *Washington Public,* 19 F.3d at 1301-02). *See generally Newberg*, §14:6, p.578 ("Multiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied. [Fn.86] A

large common fund award may warrant an even larger multiple. [Fn.87]")
(emphasis supplied).

Since, as we have indicated, the multiplier involved here amounts to less than two – a modest multiplier by any standard – the fee sought here is justified even if the lodestar method of fee computation is used.

## IV.   FAILING TO AWARD THE FEES AND COSTS REQUESTED WOULD FRUSTRATE THE PURPOSES OF CLASS ACTIONS IN THE CONTEXT OF THIS SETTLEMENT.

Because of the structure of the settlement agreement, the $1,400,000 allocated to fees and costs is separate from the individual class members' recovery, i.e., class members will not receive more if a lower fee is awarded. It is well established that one important purpose of the class action device is that defendants should not benefit from their wrongdoing, and should be deterred from doing so by being vulnerable to class actions to remedy their wrongful conduct. *See, e.g.*, Richard A. Posner, *Economic Analysis of Law* 626-27 (5th ed. 1998) ("the most important point from an economic standpoint is that the violator be confronted with the costs of his violation-this achieves the allocative purpose of the suit-not that he pays them to his victims"); John C. Coffee, Jr., *Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation,* 2-3 (Columbia Law. Sch. Ctr. for Law & Econ. Studies, Working Paper No. 293, 2006) (available at http://ssrn.com/abstract_id =893833 ("[d]eterrence... is the only rationale that can justify the significant costs--both public and private--that securities class actions impose on both investors and the judiciary").

Through the deterrence prism, the defendants would receive an unjustified windfall if the requested fees were not granted in full. In addition, it is critically important to provide appropriate incentives for attorneys to undertake the risk of class litigation. To the extent they are not properly awarded when they are successful, that undermines the deterrent purpose of the class action mechanism.

22

1   As recent commentators have observed, if the economic interests of the class and

2   counsel are mis-aligned, class counsel lose the incentive to maximize the benefit to

3   the class because they do not participate, or do not fully participate, in the benefit

4   of a larger recovery. *See, e.g*., Myriam Gilles, *Exploding The Class Action Agency*

5   *Costs Myth: The Social Utility Of Entrepreneurial Lawyers*, University of

6   Pennsylvania Law Review, 155 U. Pa. L. Rev. 103 (November 2006).

7   **V.    CONCLUSION**

8         For the foregoing reasons, plaintiffs respectfully request that the Court

9   award the class fund attorney's fees and costs in the amount of $1,400,000.

10   Dated October 27, 2008        Respectfully submitted,

11                        LITT, ESTUAR, HARRISON, & KITSON,

12                        LLP

13                        LAW OFFICES OF EARNEST C. S. BELL

14  

15                        By: __/s/  Barrett S. Litt_____

16                            Barrett S. Litt

                             Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28