UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN GAMINO, individually and as class representative; KATHY CONLEY, individually and as class representative; ED FERREL, individually and as class representative,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF VENTURA; VENTURA COUNTY SHERIFF BOB BROOKS, individually and in his capacity as Sheriff of Ventura County; DOES 1-10,<br><br>Defendants. | CASE NO. CV-02-9785 CBM (Ex)<br><br>**ORDER AWARDING CLASS COUNSEL ATTORNEYS' FEES AND COSTS** |

    The matter before the Court is Plaintiffs' Motion for Attorneys' Fees (the "Motion"). Upon consideration of the papers and arguments presented, the Court GRANTS Plaintiffs' Motion.

1

**BACKGROUND**

This case is a class action on behalf of new arrestees booked into in the Ventura County Jail charged with violations of California Health and Safety ("H&S") Code §11550, who were strip searched pursuant to the then policy of the Ventura County Jail to do so without individualized suspicion. The case was settled on terms enumerated in the Preliminary Approval Order and documents attached thereto, and those terms will not be repeated here.

The custom and practice that was the basis of this lawsuit was ceased as a result of the litigation in the related action, *Way v. County of Ventura*, 445 F.3d 1157 (9th Cir. 2006) (hereafter *Way*) and this case. *Way* was an individual plaintiff case, also before this Court. *Gamino* was filed separately after *Way*, as a class action. After favorable decisions in this Court and the Ninth Circuit, granting summary judgment to plaintiff *Way* on liability, *Way* was settled for a total of $575,000. Of that amount, $500,000 was for fees and costs, and the remainder was for the plaintiff.

This case subsequently settled, after extensive mediation efforts. The Court approved the settlement at a hearing held on February 2, 2009. [Doc. No. 182.] Under the settlement, defendants would pay sums to class representatives, and various sums to class members who file claims, and would pay for the cost of class administration. In addition, defendants would pay $1,400,000 in attorneys' fees and costs, subject to the approval of this Court.

Plaintiffs filed a motion for attorneys' fees seeking the $1,400,000 award agreed to, based on both a class fund theory and a lodestar with a multiplier theory. For the reasons stated below, the Court awards Plaintiffs' counsel $1,400,000 in attorneys' fees and costs.

## LEGAL STANDARD

It is well settled in the Ninth Circuit that, "[i]n a common fund case, the district court has discretion to apply either the lodestar method or the percentage-of-the-fund method in calculating a fee award." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1006 (9th Cir.2002). "Reasonableness is the goal." *Id.* at 1007. To calculate an award of reasonable attorney's fees, courts use the lodestar formulation set forth in *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), which instructs the court to take the number of hours reasonably expended on the litigation and multiply it by a reasonable hourly rate. In determining the "lodestar figure," courts must consider the *Kerr* factors:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).

## DISCUSSION

### A.  The Time and Labor Expended By Counsel

Counsel efforts in litigating this case were substantial. The work performed included: 1) extensive investigation of the underlying circumstances, including speaking with scores of class members; 2) preparation of the complaint; 3) the Rule 26 conference and report; 4) three requests for production of documents; 5) extensive analysis of documents produced; 6) three set of interrogatories; 7) 12 depositions; 8) three discovery motions; 9) a motion to compel Sheriff Brooks' deposition; 10) three summary judgment motions; 11) two published appeals in *Way* (one remanding because appealed order was not final for purposes of appeal, and the second upholding this Court's grant of summary judgment to Plaintiff

3

Way); 12) preparation and mailing of first class notice (pre-settlement); 13) handling of hundreds of class members' calls after mailing of first class notice; 14) retention of data consultants and extensive analysis of computerized jail data; 15) list of charges qualifying as charges of violence, weapons or drugs for purposes of the different levels of class claims; 16) three days of unsuccessful mediation efforts with Ret. Magistrate Judge Edward Infante (including multiple mediation sessions); 17) four mediation sessions with Magistrate Judge Charles Eick; 18) preparation of a 14-page mediation letter in anticipation of mediation with Ret. United States District Judge Raul Ramirez; 19) two days of mediation sessions with Judge Ramirez; 20) and negotiation and preparation of settlement documents, including settlement agreement, preliminary and final approval orders, class notice and claim forms.

In summary, the time and efforts expended by Class Counsel were extensive and involved all that occurs in a case that is being prepared for trial.

**B.     The Novelty and Difficulty of the Issues and Counsel's Skill**

The issues involved in this case involve complex issues of constitutional law in an area where considerable deference is given to jail officials, as the Ninth Circuit recognized in the partial summary decision in this case. *See Way v. County of Ventura, supra,* 445 F.3d at 1161 (9th Cir.2006) ("We recognize the difficulty of operating a detention facility safely, the seriousness of the risk of smuggled weapons and contraband, and the deference we owe jail officials' exercise of judgment in adopting and executing policies necessary to maintain institutional security."); *see also Craft v. County of San Bernardino,* 468 F.Supp.2d 1172, 1176 (C.D.Cal. 2006) (quoting *Way*).

The *Way* case, which provided the legal foundation for the settlement here (as the parties stipulated that the outcome of *Way* would govern liability here), involved difficult questions of constitutional law. A good snapshot of the state of

the law at the time is contained in *Way v. County of Ventura*, 445 F.3d 1157, 1159 (9th Cir.2006), where the Court provided the following summary:

> Way brought this civil rights action ... alleging that they violated her civil rights under the Fourth and Fourteenth Amendments by subjecting her to a body cavity search following her arrest. The parties both filed motions for summary judgment. The district court held that the search violated *Way*'s constitutional rights because individualized suspicion is required for arrestees who are not admitted to the general jail population. It denied qualified immunity to Brooks and Hanson on the basis of *Giles v. Ackerman*, 746 F.2d 614, 616-17 (9th Cir.1984) (per curiam), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir.1999) (en banc); *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 711 (9th Cir.1990) (as amended), *implied overruling on other grounds recognized by Act Up!/Portland v. Bagley*, 971 F.2d 298, 301 (9th Cir.1992); and *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1446 (9th Cir.1991), holding that a reasonable officer reviewing Ventura's policy and the established law would have recognized that the Sheriff Department's policy was unconstitutional because it did not further any legitimate penological interests. That ruling is the subject of this appeal.

What was distinct about this case and the *Way* case was that it involved strip searches of arrestees charged with a drug offense. The Ninth Circuit had ruled long before that the involvement of drugs supplied reasonable suspicion for a strip search. *See, e.g., Thompson v. City of Los Angeles*, 885 F.2d 1439, 1447 (9th Cir. 1989) (reasonable suspicion may be supplied by the nature of the charge).

Thus, the plaintiff in *Way* had to prevail on the argument that being under the influence of drugs was fundamentally different in kind from possession or trafficking in drugs and did not provide reasonable suspicion for a strip search. Plaintiff succeeded in that contention, paving the way for the current settlement. *See Way*, 445 F.3d at 1162 ("We cannot see how the charge of being under the influence of a drug necessarily poses a threat of concealing (and thereby using or trafficking) additional drugs in jail during the limited time between booking and bail, or booking and placement in the general population. If not, it was unreasonable to assume that *Way* harbored drugs in some cavity or other."). Plaintiff ultimately prevailed before the Ninth Circuit, which acknowledged it had never directly addressed the issue in deciding that the Sheriff was entitled to

qualified immunity. *Id.* ("we had never previously addressed the constitutionality of a body cavity search policy premised on the nature of this or any other drug offense. More importantly, we had held that the nature of the offense alone may provide reasonable suspicion [citation omitted], and twice pointed to charges involving drugs, contraband and violence as the kind of offense that might give rise to reasonable suspicion.").

In addition, properly handling the data in cases of this type requires a high degree of sophistication. In cases like this, proper use of the data is the factual key to the case (along with establishing the policies or customs being challenged, which occurred during the *Way* case). It is through the data that members of the class are identified. This is usually a sophisticated process, requiring counsel familiar with both the facts of the case and how to use the data. Jail data is not configured to straightforwardly answer the questions for which answers are needed to determine class composition. Code has to be written to take all of those factors into account. Then the analysis has to be discussed between Plaintiffs and Defendants, in order to work out agreement on the data issues. All of this occurred here.

There are relatively few attorneys qualified to handle the data issues in a case such as this to the maximum degree of effectiveness. When Mr. Barrett Litt came into the case, Plaintiffs had not yet undertaken an independent data analysis. After Mr. Litt's entry, data consultants he had used previously analyzed all the data. As a result, the class list changed. In addition, an entire group of individuals were identified for whom no determination could be made based on the available data as to whether they were strip searched. This is because, for the earlier part of the class period, the data only captured the lead charge, but there may have been a secondary §11550 charge on the basis of which the arrestee was strip searched.

The solution to this problem was developed through the use of the Possible Class Member mailing.

### C. The Risks Of Non-Payment Assumed By Counsel and Preclusion of Other Employment

Plaintiffs' counsel faced a substantial risk of non-payment, in part because counsel took this case on a contingency fee basis. Obviously, the County had the resources to pay a judgment. However, the risk lay in establishing that the County's policies were illegal. As discussed previously, strip search litigation in general is inherently risky because of the deference given jail officials, and because there is a split in circuits developing. Seeking large amounts of money from government entities always carries risks of politics entering into the equation.

Declarations filed in support of Plaintiffs' motion for attorneys' fees from experienced class and civil rights lawyers noted several particular difficulties in litigation of this kind, including 1) particular challenges and expertise exist to establish a policy or custom under *Monell v. Dept. Soc. Serv.*, 436 U.S. 658, 690 (1978); 2) great deference is given to jails in addressing security issues; 3) the law often differs from circuit to circuit; and 4) there is a greater risk than normal that the whole legal landscape could change by virtue of a change in the law, particularly if the Supreme Court addresses the issue (which it has not done in the area of strip searches of pre-trial detainees since *Bell v. Wolfish*, 441 U.S. 520 (1979), almost 30 years ago. The Court agrees that all of these reflect risks for Plaintiffs' counsel in pursuing litigation of this type.

Class counsel, particularly Mr. Earnest Bell, declined substantial other work to pursue this case. These two cases combined (*Way* and *Gamino*) spanned many years when the outcome was uncertain. Over 2000 hours were devoted to the combined *Way* and *Gamino* cases.

### D. The Result Obtained For The Class

This case was hard fought. The *Way* case, in which the key merits issues were fought out, went through extensive briefing in this Court and the Ninth Circuit. The Plaintiffs were individuals of little means. All the work was performed on a contingent fee basis. The settlement was the result of arm's length negotiations entered only after Plaintiff won the *Way* case. Even then it required over a year of settlement efforts, and the addition of Mr. Litt to Plaintiffs' attorney team, to reach a settlement.

The financial terms of the settlement are very favorable to class members. Those not charged with crimes of violence or involving other drug charges receive $2300 for a first offense and $700 for a second offense. This is considerably higher than the average recovery in other strip search class actions. (*See* B. Litt Dec. at ¶ 35, [Doc. No. 176], filed concurrently with Plaintiffs' Motion.) While this is partly explained by the scale of the other cases compared to this one, the fact remains that class members are receiving very favorable payments. In addition, even those charged with other drug charges or crimes of violence are participating in the settlement, even though the law in this Circuit is that such charges provide reasonable suspicion to strip search pre-arraignment arrestees. All of this is due exclusively to Class Counsel's efforts.

Nor can the results in this case be judged solely by the monetary component of the settlement. As a result of the combined *Way* and *Gamino* litigation, the County long ago ceased all of the strip search practices addressed in this settlement. That is a major accomplishment, particularly in light of the standing limitations imposed on such cases. Thus, as a result of Class Counsel's efforts, tens of thousands of future inmates have been spared the "embarrassing and humiliating experience", and "extensive intrusion on personal privacy", that a strip

search, "regardless of how professionally and courteously conducted", necessarily entails. *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982).

### E. Experience, Reputation and Ability of Class Counsel

Class Counsel are highly experience litigators in the fields of civil rights and class actions. Mr. Litt is widely known as one of the foremost civil rights attorneys in California, having a particular expertise in civil rights class actions and other complex multi-party civil rights cases, especially law enforcement class actions. He has both spoken and published on the issue of strip search and law enforcement class actions at some length, and is counsel in several other pending class actions, both in California, and in other parts of the country (Washington, D.C., Baltimore and Atlanta). In addition, he has several $1 Million plus civil rights trial verdicts, including a $22.5 Million verdict against the City of Long Beach, which is the largest Fair Housing verdict on record. He has settled three strip search class actions for eight figure sums, aside from this one. (*See* Dec. of B. Litt at ¶¶ 1-12, and his curriculum vitae attached as Exhibit 1.)

Mr. Bell is an experienced civil rights litigator, who has practiced primarily in Ventura County, and has been the most prominent plaintiffs' police abuse attorney in Ventura County for many years. He litigated the *Way* case through the Ninth Circuit and settlement. In addition, Mr. Bell litigated the first part of the *Gamino* case and brought in Mr. Litt when he determined that the settlement process would be aided by a civil rights lawyer experienced in class actions.

### F. The Reaction Of The Class

The reaction of the class was very favorable. There were no objections to the settlement. There were only five opt-outs (which is approximately 1/10 of 1%). Over 1000 Claim Forms were timely filed.

9

### G. $1,400,000 Is A Reasonable Fee In This Case

In this case, Plaintiffs' counsel seek an award of $1.4 Million, in addition to the $500,000 received in the *Way* case. This encompasses both fees and costs. (Costs are relatively modest, totaling under $15,000, which includes all the specialized data work performed by consultants retained by Plaintiffs.) The table below reflects the lodestar calculation for Plaintiffs' counsel's work in this case.

| Attorney | Hourly Rate | Hours | Total |
|---|---|---|---|
| Earnest Bell | $600 | 1,602.50 | $961,500.00 |
| Barrett S. Litt | $750 | 187 | $140,250.00 |
| Charla Gray | $275 | 5.3 | $1,457.50 |
| Julia White | $235 | 37 | $8,695.00 |
| **Total** | | | **$1,111,902.50** |

The rates used here are reasonable. Mr. Bell and Mr. Litt have been attorneys since 1988 and 1970, respectively. (Dec. of B. Litt at ¶ 3; Dec. of E. Bell at ¶ 2, attached as Exhibit 2 to Dec. of B. Litt.) Combined, they have 60 years' litigation experience. Mr. Bell, an attorney with 21 years' experience, is the leading plaintiffs' police practices civil rights attorney in Ventura County. (Dec. of E. Bell at ¶¶ 2, 5.) Over the last several years, police misconduct cases have comprised about 90% of his practice. (*Id.* at ¶ 5.) Mr. Litt has 38 years' experience and for the last 25-30 years has focused his practice on complex civil litigation in the areas of constitutional law, civil rights law, class action litigation and complex multi-party litigation. (Dec. of B. Litt at ¶ 3.) In the area of class actions against jails for violation of civil rights involving strip searches, specifically, Mr. Litt is considered one of the leading plaintiffs' lawyers in the country. (*Id.* at ¶ 8.) The rates used by Mr. Bell and Mr. Litt are comparable to Los Angeles market rates for complex litigation. (*See id.* at ¶¶ 10-21; Dec. of E. Bell at ¶ 11.)

In addition, numerous declarations have been filed that were submitted in *Craft v. County of San Bernardino*, 2008 WL 916965 (C.D.Cal. April 01, 2008),

establishing the reasonableness of these rates, and those declarations are a year out of date. Mr. Litt also submitted a declaration establishing that his then current rates have frequently been awarded by courts, and that the rates here reflect his firm's current rates.

In *Craft*, District Judge Stephen Larson, using 2007 rates, found that "rates ranging from a high of $725 per hour for Mr. Litt to a low of $275 for 2006 graduates, as well as law clerk rates of $200 per hour and paralegal rates from a low of $110 to a high of $225 per hour" were "supported by numerous declarations... establish[ing] that the hourly rates set are similar to those for attorneys of comparable skill and experience at the rates paid for complex federal litigation" and that "the rates sought are reasonable and reflect the market for attorneys of comparable skill, experience and expertise in complex federal litigation." *Craft*, 2008 WL 916965 at 9. Judge Larson also noted that it "was Congress' intent for civil rights cases [to use the standard of complex litigation in setting civil rights fee rates]. *See City of Riverside v. Rivera,* 477 U.S. 561, 575-576 (1986) (quoting Senate Report, at 6, U.S. Code Cong. & Admin. News 1976, p. 5913, *supra,* (Congress intended civil rights fees to be comparable to that for 'other types of equally complex Federal litigation, such as antitrust cases')." *Id.*

Plaintiffs anticipate that the lodestar will increase by approximately $100,000 plus in the course of the remaining work on the case, including work between now and the settlement and work over the ensuing period through the final distribution of the funds. (The post-settlement work is expected to be somewhat extensive due to the process of deciding issues such as which possible class members are in fact class members, lien issues and the like). Thus, the total lodestar is approximately $1.2 Million. The total fee award, including the $500,000 awarded in *Way*, is $1.9 Million, which would result in a multiplier of approximately 1.6 ($1.2M x 1.6 = $1.9M).

This is a modest multiplier. Many class action cases have authorized far higher multipliers. *See, e.g., Craft v. County of San Bernardino*, 2008 WL 916965 (C.D.Cal. 2008) (multiplier of 5.2 in strip search class action); *In re Charter Communications, Inc., Securities Litigation*, 2005 WL 4045741, 18 (E.D.Mo. 2005) (multiplier of 5.61); *In re Rite Aid Corp. Sec. Litig*, 362 FSupp.2d 587 (E.D.Pa. 2005) (multiplier of 6.96); *Di Giacomo v. Plains All Am. Pipeline*, Nos. H-99-4137, H-99-4212, 2001 U.S. Dist. LEXIS 25532, at 31, 2001 WL 3463337 at 10 (S.D.Tex. Dec. 18, 2001) (multiplier of 5.3); *Roberts v. Texaco, Inc.*, 979 F.Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5, plus fund set aside for post-settlement work); *Bynum v. District of Columbia*, 412 F. Supp. 2d 73 (D.D.C. 2006) (multiplier of 2 in strip search class action); *Kuhnlein v. Department of Revenue*, 662 So.2d 309, 315 (Fla. 1995) (class fund award of 10% of $188,100,000, resulting in multiplier of approximately 15, reduced by Fla. Supreme Court to multiplier of 5 times lodestar, because lodestar was proper method under Florida law). See also cases cited in the Appendix in *Vizcaino v. Microsoft Corp.*, 290 F3d 1043 (9th Cir. 2002) (containing several cases with multipliers of three and higher).

In this case, Plaintiffs' counsel obtained a relatively expeditious and "excellent result" in a "complex and risky case". *See Stop & Shop*, 2005 WL 1213926 (E.D.Pa.), *supra*. The *Way/Gamino* case, when initially filed in *Way*, was a very risky case. The size of the recovery for class members is substantial. The "skill and experience brought to bear by counsel throughout the year[s] they spent actively litigating this case, and the economy with which they were able to achieve such a noteworthy settlement" all speak to a substantial fee award. Further, "the award is justified by the high caliber of Plaintiffs' counsels' work in this case." *Stop & Shop, supra*.

### H. Awarding Fees and Costs Requested Advances the Purposes of Class Actions in the Context of This Settlement

Because of the structure of the settlement agreement, the $1,400,000 allocated to fees and costs is separate from the individual class members' recovery, *i.e.*, class members will not receive more if a lower fee is awarded. An important purpose of the class action device is that defendants should not benefit from their wrongdoing, and should be deterred from doing so by being vulnerable to class actions to remedy their wrongful conduct. *See, e.g.*, Richard A. Posner, *Economic Analysis of Law* 626-27 (5th ed. 1998) ("the most important point from an economic standpoint is that the violator be confronted with the costs of his violation-this achieves the allocative purpose of the suit-not that he pays them to his victims").

Through the deterrence prism, the defendants would receive an unjustified windfall if the requested fees were not granted in full. In addition, it is important to provide appropriate incentives for attorneys to undertake the risk of class litigation. To the extent they are not properly awarded when they are successful, that undermines the deterrent purpose of the class action mechanism. As recent commentators have observed, if the economic interests of the class and counsel are misaligned, class counsel lose the incentive to maximize the benefit to the class because they do not participate, or do not fully participate, in the benefit of a larger recovery. *See, e.g.*, Myriam Gilles, *Exploding The Class Action Agency Costs Myth: The Social Utility Of Entrepreneurial Lawyers*, University of Pennsylvania Law Review, 155 U. Pa. L. Rev. 103 (November 2006).

### CONCLUSION

Based on the foregoing, the Court GRANTS Plaintiffs' Motion for Attorneys' Fees. Defendants are ordered to pay Class Counsel attorneys' fees and

costs in the amount of $1,400,000 pursuant to Paragraph ¶ 26 of the parties' Settlement Agreement [Doc. No. 171].

IT IS SO ORDERED.

DATED: February 5, 2009          By /s/ *signature*
                                 CONSUELO B. MARSHALL
                                 UNITED STATES DISTRICT JUDGE